**In the United States District Court
for the District of Kansas**

―――――――

Case No. 21-cr-40033-TC

―――――――

UNITED STATES OF AMERICA,

*Plaintiff*

v.

DAVID GLENN CULPEPPER,

*Defendant*

―――――――

**MEMORANDUM AND ORDER**

While sitting in his home, David Glenn Culpepper intentionally shot himself in the leg and summoned authorities into his home to provide medical aid. As he was being transported in an ambulance, responding officers learned that he was prohibited from possessing the firearm with which he shot himself. The United States subsequently charged Culpepper with a federal crime: possession of a firearm by a prohibited person, 18 U.S.C. § 922(g)(1). Doc. 1. Culpepper moves to suppress evidence collected from his home after he had been removed by medical personnel because, he contends, the officers' conduct while remaining in the home violated the Fourth Amendment. For the following reasons, Culpepper's motion is denied.

**I**

**A**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches and seizures—of people, their homes, and their personal property—are presumed unreasonable when conducted without a warrant. *Id.*; *United States v. Karo*, 468 U.S. 705, 717 (1984).

1

Courts must be especially sensitive in cases involving searches and seizures in the home because, in the Fourth Amendment context, "the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *accord Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). But that does not mean that every warrantless search or seizure within a home is impermissible: "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

In the event of a warrantless search or seizure, the Government may rebut the presumption of unreasonableness by showing that an exception to the warrant requirement applies. *See Brigham City*, 547 U.S. at 403 While it is a defendant's burden to show the Fourth Amendment is implicated, once he carries that burden, the Government must prove the conduct in question was reasonable. *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020).

One way the Government can establish reasonableness is to show that law enforcement officers acted under exigent circumstances. *Brigham City*, 547 U.S. at 403. For example, in a situation involving assistance to "persons who are seriously injured or threatened with such injury," the warrant requirement is obviated and "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). Yet they do not have license to remain in the home indefinitely. *United States v. Shrum*, 908 F.3d 1219, 1230 (10th Cir. 2018). Instead, the seizure of a home must "remain reasonable 'throughout its duration and in the entirety of its scope.'" *Id.* (quoting *United States v. Martinez*, 518 F.3d 763, 766 (10th Cir. 2008)). Courts "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Illinois v. McArthur*, 531 U.S. 326, 331 (2001).

### B

On the evening of February 2, 2021, Topeka Police Department Officer Tyler Wohler responded to a call from an individual seeking assistance. Doc. 12 at 2. Wohler arrived at the home of Defendant Culpepper to conduct a welfare check. *Id.* The two spoke, and Culpepper requested to be taken to jail. *Id.*; Doc. 16 at 49 (Tr. Mot. to Suppress Hr'g). Wohler declined and instead offered to take Culpepper to a mental health facility. Culpepper rejected that offer, ended the conversation, turned around, entered his house, and shut the door. Doc. 16

at 50. Wohler entered a few comments about this interaction into the police log and resumed his third-shift patrol duties. *Id.*

Later that night, Culpepper again called the TPD requesting assistance. Doc. 16 at 15. In the call, Culpepper indicated that he had suicidal ideations and that he had already shot himself in the leg. Doc. 12 at 2. Three TPD officers responded to the call: Clarisa Warfield, Zachary Mumford, and Mark Hershberger. *Id.* at 2; Doc. 16 at 15.

The responding officers found the door to the home ajar with Culpepper just inside on the floor, moaning, bleeding, and in obvious pain. Doc. 12 at 2. Hershberger commanded Culpepper to show his hands and not move. Doc. 16 at 15. When asked where the firearm was located, Culpepper rolled over and revealed a pistol (later determined to be a Taurus 709 9mm) on the floor underneath him. Doc. 12 at 2. Mumford saw a second pistol (later determined to be a Stoeger Cougar 8000FT 9mm) lying in plain view on an end table nearby. *Id.* The officers also saw spent bullet casings and a live round on the floor nearby. Doc. 16 at 16. The officers moved the pistols away from Culpepper, administered emergency aid, and called emergency medical personnel.

After calling emergency personnel, the officers began securing the scene within Culpepper's home. Doc. 16 at 16–17. Hershberger, concerned with the safety of the officers, asked Culpepper whether anyone else was in the home. *Id.* at 19. Culpepper said he had sent everyone away and that the house was empty. Doc. 12 at 3. Hershberger and Mumford conducted a protective sweep of the home to verify that it was safe from additional threats and that there were no other victims. Doc. 12 at 3; Doc. 16 at 18–19. No one else was found in the home. Doc. 12 at 3.

As Hershberger completed his sweep of the basement, he told another officer "[i]f it were on me, I'd take the firearms and put them in property because of self-harm." Doc. 16 at 19. Officers testified that they were concerned that if Culpepper were not able to enter inpatient treatment, he might return to his home and attempt to harm himself again. *Id.* at 19–20. Based on the risk of continued self-harm, the officers initially decided to seize the firearms while Culpepper was taken for treatment. *Id.* at 21.

While the officers were discussing what to do with the firearms, paramedics arrived and began treating Culpepper. Doc. 16 at 18. The paramedics placed him on a stretcher and asked routine questions,

including who he was. *Id.* at 21. Hershberger responded that the officers "know who he is." *Id.* At the suppression hearing, Hershberger testified that at the time he believed and had a general awareness that Culpepper had been convicted of a crime based on the officer's prior interactions with Culpepper. *Id.* at 22. But Hershberger said that, at the time, he did not have specific information about any prohibition on Culpepper possessing a firearm. *Id.* at 34.

About 11 minutes into the encounter, the paramedics removed Culpepper from the home. Doc. 16 at 22, 46. Warfield left the scene to follow the ambulance, while Hershberger and Mumford remained in Culpepper's home, photographing and documenting evidence related to Culpepper's self-inflicted injuries. Doc. 12 at 3.

Less than three minutes after Culpepper was removed from the home, Doc. 16 at 46, Mumford searched the pistols for their serial numbers and checked with dispatch to see if the guns had been reported as stolen, *id.* at 22. They had not. *Id.* at 23. Those serial numbers are significant because, as Culpepper's counsel noted in the suppression hearing, Doc. 16 at 10, they will aid the Government in establishing the federal nexus of this case.

Four minutes after Culpepper was removed, Wohler returned to Culpepper's home. Doc. 16 at 46. While on an unrelated traffic stop, he had heard the police dispatch with Culpepper's address and recognized it as the same home he had visited earlier in the evening. *Id.* at 51. When Wohler arrived, he informed the other officers that he had been to Culpepper's residence earlier. *Id.* Hershberger advised Wohler that he had personal knowledge of Culpepper's possible criminal background, which would preclude him from possessing firearms. *Id.* Wohler then checked the Kansas Adult Supervised Population Electronic Repository (KASPER) for Culpepper. *Id.* at 51–52. Wohler learned that Culpepper had a felony drug conviction in Shawnee County that would qualify as a prohibiting state conviction. *Id.* at 30, 52.

While Wohler checked the KASPER system, Hershberger and another officer spoke with their watch commander by radio, to determine what to do about Culpepper. Doc. 16 at 28. At one point they considered arresting Culpepper for violating a city ordinance that prohibited reckless discharge of a firearm. After learning that Culpepper was not permitted to lawfully possess firearms, the officers abandoned that idea. Instead, they seized the two firearms that they saw when they first

entered the home, kept them in custody, and swabbed each for DNA. Doc. 12 at 4.

Culpepper survived the gunshot injury but was later indicted for being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). Doc. 1 at 1. Culpepper concedes that the initial entry into and "seizure of the residence inherent in this entry" were reasonable, arising under the emergency-aid exception of the exigent-circumstances doctrine. Doc. 12 at 7. He also acknowledges that the officers saw the firearms in plain view while lawfully in the home. Further, he takes no issue with the KASPER check that led officers to discover his status as a prohibited person. Instead, Culpepper contends that the officers' presence in the home *after* emergency medical personnel removed him violated the Fourth Amendment. Because it was during this period that the officers located the serial numbers on the weapons[1] and subsequently seized them, the fruit of that unlawful presence within the home should be suppressed. Doc. 16 at 67–68.

An evidentiary hearing was held on September 23, 2021. Doc. 15. The parties presented live testimony and oral argument. In addition to their motion briefs, the parties submitted supplemental briefs addressing issues discussed at the hearing. Docs. 15, 17 & 19.

## II

Culpepper's argument that the seizure of his firearms violated the Fourth Amendment has two components. First, Culpepper argues that the police should not have remained in his home after he left in the ambulance, effecting an unconstitutional seizure of his home. Doc. 12 at 5. Second, the officers, having failed to leave the home once the exigency had ended, lacked the legal authority to remain in the home and check the firearms (and their corresponding serial numbers) without a warrant. Doc. 12 at 11. As a result, Culpepper argues, all evidence obtained after he was removed should be suppressed. Doc. 12 at 11. Culpepper does not dispute the initial entry into his home or the seizure of the firearms prior to his removal. Neither does he contest the officers' actions once inside the home, such as securing the firearms

---

[1] As mentioned, the serial numbers relate to the federal nexus element of 18 U.S.C. § 922(g), by providing evidence of the firearms' movement in interstate commerce. *See* 18 U.S.C. § 922(g); *United States v. Silva*, 889 F.3d 704, 711 (10th Cir. 2018).

and moving them away from Culpepper or making the protective sweep of the home. Doc. 12 at 6–8.

Resolution of Culpepper's motion turns on whether it was reasonable for officers to remain in his home and continue their search without a warrant *after* he left with emergency medical personnel. Culpepper's motion raises a somewhat novel application of facts. That is, whether the Fourth Amendment requires law enforcement officers to vacate a home, in which they were lawfully present, immediately after emergency medical personnel have removed the gunshot victim and before completing their collection of information related to the shooting. Culpepper argues that immediate retreat is required. Doc. 19 at 10 (focusing on "the seizure of the two pistols as evidence, as well as any police photographs and observations within the home made after Mr. Culpepper's removal").

Culpepper's arguments fail as a matter of law. The officers were invited into Culpepper's home to administer emergency aid and did not unreasonably extend the seizure of his residence beyond attempting to ascertain the basic nature of the event they had been called to address. Their presence for a brief period after Culpepper left was not, under the circumstances, unreasonable. Accordingly, and for the reasons below, Culpepper's motion to suppress the evidence from the time after his removal is denied.

**A**

The context of this dispute is important. All of the relevant conduct happened within *minutes* of emergency medical personnel removing Culpepper from his home and transporting him to the hospital. The check of the serial numbers on the weapons within the home happened three minutes after he was removed. And the check of Culpepper's criminal record was just seven minutes after that.[2] In other words,

---

[2] Culpepper admits that there is no constitutional concern about the determination that Culpepper was a prohibited person as a prior felon. Doc. 16 at 63. That inquiry occurred while Wohler was outside the home and was prompted by information known to the officers, not gathered from within the home. Furthermore, the check of the firearms and of Culpepper's identification through NCIC and KASPER is not a search—rather, it is a matter of routine procedure. *See United States v. White*, 326 F.3d 1135, 1138–39 (10th Cir. 2003).

this dispute arises as a matter of happenstance. Specifically, if Culpepper had remained in the home with medical personnel, it is not seriously disputed that the officers' conduct would merit no additional Fourth Amendment scrutiny. Doc. 16 at 67–68 (acknowledging the difficulty arises from the timing of Culpepper's removal from the home).

In addition, Culpepper is not asking for all the evidence in his home to be suppressed. For instance, he does not—and cannot reasonably—dispute that officers may testify about seeing the firearms in plain view, about Culpepper's statements in the house, and about the self-inflicted gunshot wound. Instead, Culpepper seeks to suppress only the evidence obtained after he left—including the serial numbers and photographs of the firearms taken after he was removed—which, if admitted, may be relevant to the interstate commerce element of the Section 922(g) charge that Culpepper faces. 18 U.S.C. § 922(g); *United States v. Silva*, 889 F.3d 704, 711 (10th Cir. 2018); *see also United States v. Benford*, 875 F.3d 1007, 1015 (10th Cir. 2017). But it is not entirely clear that, even if the officers' continued presence were unconstitutional, suppression would be an appropriate remedy. *See generally United States v. Gordon*, 741 F.3d 64, 73–74 (10th Cir. 2014) (suggesting *de minimis* violations may not warrant suppression).

## B

The parties' arguments and authorities do not fully capture the novelty of the issue raised by Culpepper's motion. Nonetheless, they provide data points that support the reasonableness of the officers' conduct.

**1.** For example, the parties' supplemental briefs each addressed *United States v. Gordon*, 741 F.3d 64 (10th Cir. 2014). Doc 17 at 24; Doc. 19 at 3–5. In *Gordon*, a domestic-violence victim asked officers to enter the home because she believed her life was in danger. *Gordon*, 741 F.3d at 68. Gordon had assaulted her with a sword a few days earlier and kept multiple weapons in the home. *Id.* Upon entry into the home, officers secured the victim, seized several swords and Gordon's loaded shotgun, and arrested Gordon for aggravated assault. *Id.* Because the victim was transported to the hospital and Gordon was going to jail, officers held on to the shotgun and locked the home. While en route to the jail, the officers learned that Gordon was a felon and could not lawfully possess the shotgun. *Id.* at 68–69. The Tenth Circuit held that

the seizure of the shotgun was a violation but that it was *de minimis* and did not warrant suppression. *Id.* at 73–74.

*Gordon* is informative but not dispositive. In *Gordon*, the implicated interest was the possessory right to a firearm. But here, the right involves the protection and privacy of the home itself. Courts have traditionally recognized the importance of protecting the home from the peering eyes and presence of government officials. The Fourth Amendment's protections are at their zenith within the home. *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *accord Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). A "man's house is his castle," *Payton v. New York*, 445 U.S. 573, 596 (1980), and has long been recognized as such, *see Semayne's Case*, 77 Eng. Rep. 194 (K.B. 1603).

In essence, Culpepper seeks a bright-line rule that would require officers to immediately leave the scene of an emergency at the moment medical personnel happen to take the homeowner across their threshold. But such a bright-line rule lacks support. Indeed, the Supreme Court's Fourth Amendment cases typically eschew such bright-line rules. *See, e.g.*, *Ohio v. Robinette*, 519 U.S. 33, 34 (1996). Instead, the Fourth Amendment "touchstone is reasonableness" and is "measured in objective terms by examining the totality of the circumstances." *Id.* So while there must logically be a point where continued police presence within the home becomes unreasonable, such a point is context-specific and depends on the reason for their presence. *See Michigan v. Tyler*, 436 U.S. 499, 511–12 (1978); *cf. Gordon*, 741 F.3d at 70 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990)).

**2.** The search incident to arrest exception does not apply, but it need not apply for the Government to prove reasonableness.[3] Culpepper argues that the officers treated his home as if he had been arrested and behaved as if the search-incident-to-arrest doctrine applied, with police "essentially treat[ing] the home as a crime scene, viewing and photographing it while awaiting information about Mr.

---

[3] To be clear, the search-incident-to-arrest exception would only apply if Culpepper had been searched after being arrested. *Contra* Doc. 17 at 5–8. Just because the officers considered whether they should or could arrest him for violating a Topeka ordinance does not provide post-hoc justification for a search. *See Virginia v. Moore*, 553 U.S. 164, 177 (2008) (limiting search interests to when an arrest is made); *see also Knowles v. Iowa*, 525 U.S. 113, 115 (1998) (rejecting extension of the search-incident-to-arrest doctrine to police issuance of a traffic citation).

8

Culpepper's status as a felon." Doc. 19 at 2–3. But, in fact, the officers were involved in a tense, uncertain, and evolving situation where an individual with a gunshot wound had two nearby firearms and numerous shell casings strewn about his floor. Officers reasonably prioritized getting paramedics and then securing the scene. *See Brigham City*, 547 U.S. at 403–04. That judgment—and Culpepper's medical needs—do not obviate the need to make a record of the area, where a shooting had occurred and where they had been invited to enter. *See Tyler*, 436 U.S. at 511. And, although there are markedly distinct interests at stake, the information verification and documentation process officers undertook is similar to the latitude that officers are afforded when making traffic stops. *See, e.g., Rodriguez v. United States*, 575 U.S. 348, 354–56 (2015) (noting that an officer's mission in a traffic stop typically involves checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration); *but cf. Caniglia*, 141 S. Ct. at 1599–1600 (recognizing the "unmistakable distinction between vehicles and homes" and the protections each are afforded).

**3.** Neither does *Arizona v. Hicks*, 480 U.S. 321 (1987), aid Culpepper's argument. *Contra* Doc. 19 at 7. In *Hicks*, a bullet was fired through the floor of Hicks's apartment, striking and injuring a man in the apartment below. 480 U.S. at 323. The officers entered Hicks's apartment to search for the shooter and, in the course of that search, observed expensive stereo equipment. *Id.* Suspecting the equipment may have been stolen, an officer moved the equipment so as to view and then record the serial numbers of the components. *Id.* The Supreme Court held that the officer, though lawfully present in the apartment to investigate the shooting, could not manipulate the stereo equipment absent probable cause to believe that it was stolen. 480 U.S. at 325 ("[T]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstances that validated the entry.").

*Hicks* is inapposite because there the officers strayed beyond the justification for being in Hicks's home and undertook general criminal investigatory action. But with Culpepper, the officers remained focused on the purpose of their presence in Culpepper's home—addressing the shooting that occurred. They entered the home to provide medical assistance to the gunshot victim and to document the scene. There is no argument that their presence strayed from that task.

## C

At bottom, the question of whether the officers' continued presence in Culpepper's home for less than twenty minutes after he was taken by ambulance is one of reasonableness. That is, was it reasonable for the officers to remain in the home—where the shooting victim had just been removed by medical personnel—to document the scene, determine whether the firearm used to commit the shooting was stolen, and determine whether, as the officers believed, Culpepper was prohibited from possessing the gun he used to shoot himself?

Instead of this context, Culpepper asks the Court to look solely at the fact that the police stayed in his home after he was taken out. That, however, is not how a reasonableness inquiry proceeds. *See Samson v. California*, 547 U.S. 843, 848 (2006). Instead, courts are to apply a totality-of-the-circumstances approach to determine whether a search or seizure is reasonable. *Id.* Reasonableness is determined by assessing "the degree to which it intrudes upon an individual's privacy and . . . the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 119 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). Courts balance the defendant's interests, the Government's interests, and the nature and extent of the intrusion. *Houghton*, 526 U.S. at 300 ("[W]e must evaluate the search or seizure under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.").

If viewed in a vacuum, Culpepper's interests were undoubtedly high. A man's home is his castle: he is entitled to privacy and to exclude the government. *Payton*, 445 U.S. at 596. An individual's right to own and possess firearms—especially within the home—is also strong. *See McDonald v. City of Chicago*, 561 U.S. 742, 768–69 (2010). But the context in which this dispute arose confirms that Culpepper's rights were not at their apex. Culpepper invited the officers into his home to render medical aid following a shooting with one of the weapons that officers saw in plain view. Officers had to physically move these weapons away from Culpepper to make sure he neither hurt them or himself while they rendered aid. And, Culpepper's right to possess a firearm is limited because he is a felon. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (recognizing the longstanding prohibition on the possession of firearms by felons and the mentally ill).

The Government's interests were significant. The officers entered the home to render emergency medical aid and "prevent[] violence and restor[e] order" so that future harm would not come to Culpepper or others. *Brigham City*, 547 U.S. at 406. Additionally, they were unsure about what exactly to do with the scene—was it a crime scene, an accident, or something else? At the very least, it is reasonable that documenting the scene advanced legitimate government interests. *Houghton*, 526 U.S. at 300; *Tyler*, 436 U.S. at 511.

Thus, the matter comes down to the nature and extent of the intrusion. That balance reinforces the notion that the intrusion was reasonable. To begin, the officers here, unlike in *Hicks*, were focused on the justification that authorized their entry into the home. They documented the scene, took photographs, and evaluated the weapons used to inflict the wound. Moreover, as in *Gordon*, this is not a case where the officers appeared to be circumventing the warrant requirement. Their testimony demonstrated that they were genuinely uncertain of what to do with the scene. It was during this uncertain and evolving situation that the officers suspected, and learned, that Culpepper was a felon prohibited from possessing the weapons. Finally, the duration of the officers' stay was limited. They ran the serial numbers within three minutes of Culpepper's departure from the home, and seven minutes later they were able to confirm their suspicion that Culpepper was a felon prohibited from owning weapons. While any seizure of a home justifiably triggers the highest concerns, the officers here did not act in a manner that was unreasonable, *Rodriguez*, 497 U.S. at 183, or "patently unconstitutional," *Herring*, 555 U.S. at 143. The officers "may remain there for a reasonable time to investigate the cause" for which they were summoned—here, a discharge of a firearm. *Cf. Tyler*, 436 U.S. at 511 (permitting firefighters to remain after exigency ended to investigate source of fire).

\* \* \*

The touchstone of the Fourth Amendment's protections is reasonableness. Based on all of the facts presented, it was not unreasonable for the officers in this case to remain in Culpepper's home without a warrant for fewer than twenty minutes after he had been taken by medical personnel. They entered the home on Culpepper's request for help and focused on processing and documenting the scene of the exigent situation.

11

### III

For the foregoing reasons, Culpepper's Motion to Suppress, Doc. 12, is DENIED.

It is so ordered.

Date:  November 12, 2021            s/ Toby Crouse
                                                                             Toby Crouse
                                                                             United States District Judge